Jeffrey E. **FREDERIKSEN** and Emerald City Corporation, an Illinois Corporation, Plaintiffs-Appellants,

v.

Edward T. **POLOWAY**,
Defendant-Appellee.

No. 80–1292.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 31, 1980.

Decided Jan. 8, 1981.

Mark H. Schiff, Kaplan, Bernstein & Waller, Chicago, Ill., for plaintiffs-appellants.

Michael H. Moirano, Howington, Elworth, Osswald & Hough, Chicago, Ill., for defendant-appellee.

Before FAIRCHILD, Chief Judge, SPRECHER and CUDAHY, Circuit Judges.

SPRECHER, Circuit Judge.

This case involves the scope of the federal securities laws. The question we confront is whether alleged fraud regarding the sale of assets and stock in a corporation falls within the scope of those laws. Not all sales transactions which involve "stock" are necessarily covered by the securities laws. Rather, the test for coverage, in general is whether the purchaser is placing money in the hands of another who will control the funds and the business decisions. If, however, the purchaser is assuming control of the critical decisions of the corporation, then the transaction is not considered to involve "securities". Here, we find that the purchaser took control of the corporation. Therefore, this situation does not involve a "security" within the meaning of the federal securities laws.

I

During the months of August through October, 1978, Jeffrey E. Frederiksen and Emerald City Corporation ("ECC") negotiated for, and then purchased, the assets and stock of North Shore Marina, Inc. ("NSM"). NSM was in the business of selling, servicing and providing storage facilities for boats at its location in Waukegan, Illinois. The negotiations culminated on October 14, 1978, with the signing of four agreements. The agreements, signed by Mr. Frederiksen, in his capacity as president of ECC, and by Edward Poloway, in his capacity as president and sole shareholder of NSM and in his individual capacity, were as follows: (1) agreement by ECC to purchase assets of NSM; (2) stock purchase and voting trust

agreement; (3) employment agreement between ECC and Mr. Poloway; and (4) management agreement between ECC and NSM.

The purchase agreement provided that NSM would sell its assets to ECC for $191,800. The purchase price was to be paid as follows: $160,000 was to be paid into an escrow account to be used to pay all existing debts of NSM and any unknown liabilities; the balance, $31,800, was to be paid in equal monthly installments over a three year period beginning October 14, 1979.

The stock purchase and voting trust agreement provided that in exchange for $10, Mr. Poloway would sell 10% of the issued and outstanding stock of NSM to ECC, and, for an additional $10 consideration, would transfer his remaining 90% of the issued and outstanding shares of NSM into a voting trust controlled by Mr. Frederiksen. The agreement also provided that after all debts of NSM were paid out of the escrow account, or earlier at the option of ECC, NSM would pay the balance of the funds to Mr. Poloway as the full price for redemption of his shares held in the voting trust.

The employment agreement provided that for a period of five years, ECC would employ Mr. Poloway to "assist, guide and give his expertise" in all areas of ECC'S business. Mr. Poloway was to perform within the "goals, guidelines, directives, policies and procedures" set forth by ECC in return for an annual salary of $32,000. As additional compensation, Mr. Poloway was to receive a consulting fee and a 20% commission on the sale of new boats, accessories, and brokerage sales.

The management agreement granted ECC authority to operate and manage the marina facilities. ECC was to receive as compensation 50% of the gross income derived from the operation of the pavilion at the Waukegan marina. All expenses ECC incurred in operating the pavilion were to be deducted from the remaining 50% of gross income, and the remaining balance was to be paid to NSM. It was the understanding of the parties, however, that the operational expenses together with the management fees to be paid to ECC under the agreement, would, in all probability, eliminate any income to NSM.

On or about May 11, 1979, ECC terminated its employment agreement with Mr. Poloway. On June 14, 1979, Mr. Poloway filed suit against ECC and Mr. Frederiksen in the Circuit Court of Lake County, Illinois for breach of contract and fraud.

On September 14, 1979, ECC and Mr. Frederiksen filed this suit in the United States District Court for the Northern District of Illinois. Plaintiffs allege that the interests they acquired in NSM are "securities" within the meaning of the federal securities acts and that, in connection with the sale of those interests, Mr. Poloway failed to disclose or misrepresented certain material facts. Plaintiffs claim that Mr. Poloway's conduct violates the 1933 and 1934 securities acts, and they seek to recover $1,250,000 in actual damages and lost profits. Plaintiffs also have asserted pendent claims for breach of the Illinois securities laws, common-law fraud, and breach of contract.

Mr. Poloway moved to dismiss the complaint, arguing that the acquisition of NSM did not involve a "security" within the purview of the federal securities laws. He argued that since there was no diversity of citizenship, there was, thus, no basis for subject-matter jurisdiction. Alternatively, Mr. Poloway argued that the complaint failed to allege fraud with particularity, and that Mr. Frederiksen was not a proper party to the action. The district court granted Mr. Poloway's motion and dismissed the suit. The plaintiffs now appeal that dismissal. We affirm the district court's dismissal on the ground that this transaction does not involve a "security" within the meaning of the federal securities laws.

## II

The critical legal issue in this case is whether the plaintiffs' acquisition of North Shore Marina involves a "security" within

the meaning of the 1933 and 1934 securities acts. We begin the analysis of this issue with a review of the purpose of the securities laws.

The purposes of and policies behind the securities laws were examined by the Supreme Court in the leading case of *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). In *Forman*, residents of a cooperative housing project, who had been required to purchase "stock" in the housing corporation in order to acquire coop units, filed an action for fraud under the federal securities laws. The Supreme Court held that the shares of stock involved did not constitute "securities" within the meaning of those laws. The Court recognized that:

> The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors.

*Id.* at 849, 95 S.Ct. at 2059. The Court emphasized that the securities laws do not apply when the goal of a purchaser is not investment but is a desire to "use or consume the item purchased." *Id.* at 852–53, 95 S.Ct. at 2060.

Recent decisions of this court recognize that the key to defining the scope of the securities laws is whether the transaction is primarily for commercial (i, e., motivated by a desire to use, consume, occupy or develop), or for investment purposes. *See Canadian Imperial Bank of Commerce Trust Co. v. Fingland*, 615 F.2d 465, 470 (7th Cir. 1980) (complaint regarding bank certificates of deposit did not plead securities fraud where it "simply describes a victim whose currency was being held in a commercial transac-

tion and not a victim-investor aspiring for profits"); *Emisco Industries, Inc. v. Pro's Inc.*, 543 F.2d 38 (7th Cir. 1976) (note given as part of sale of all assets of a corporation not an investment where there was no reliance on efforts of others to produce profit).

### III

■ We now turn to plaintiffs' claim that the interest they acquired in NSM constitute "securities" within the meaning of the federal securities laws.[1] First, plaintiffs argue that ECC's purchase of NSM stock falls under the literal wording of the federal securities laws and, for that reason, a legal presumption exists that a security was sold. There are several problems with this "literal application" theory.

The first problem is that the language in the securities acts is not as broad as the plaintiffs contend. Although 15 U.S.C. § 78c(a)(10) ("1934 Act") provides that, "[t]he term security means any ... stock," that definition, as are all the definitions in § 78c(a), is preceded by the phrase "unless the context otherwise requires." 15 U.S.C. § 78c(a). The definition of "security" in the Securities Act of 1933 is prefaced by the same phrase. 15 U.S.C. § 77b(1).

The second problem is that it is not the case that any conduct within the theoretical reach of a statute is necessarily governed by that statute. In *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892), the Supreme Court stated:

> It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.

The third problem with the plaintiffs' "literal application" argument is that the *Forman* decision and its progeny have spe-

---

1. Plaintiffs argue in their brief that the securities laws should be presumed to apply because the allegations in their complaint should be taken as true, for purposes of a motion to dismiss. But this argument begs the question. While well-pleaded allegations of the complaint are taken as true for purposes of deciding a motion to dismiss, sweeping conclusions of law and unwarranted deductions of fact are not to be taken as true. *Mitchell v. Archibald & Kendall, Inc.*, 573 F.2d 429, 432 (7th Cir. 1978).

cifically rejected that argument. The *Forman* Court stated:

> We reject at the outset any suggestion that the present transaction, evidenced by the sale of shares called "stock," must be considered a security transaction simply because the statutory definition of a security includes the words "any . . . stock." Rather we adhere to the basic principle that has guided all of the Court's decision in this area:
>
> > "[I]n searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 [88 S.Ct. 548, 553, 19 L.Ed.2d 564] (1967).

421 U.S. at 848, 95 S.Ct. at 2058 (footnote omitted). The *Forman* Court applied an "economic reality" analysis, *id.* at 849, 95 S.Ct. at 2059, including that the purchase of stock to acquire an apartment in a housing cooperative was not an investment and therefore was not within the scope of the federal securities laws. Similarly, the "literal application" theory has been rejected in post-*Forman* cases. *See, e. g., Chandler v. Kew, Inc.*, [1979] Fed.Sec.L.Rep. Transfer Binder (CCH) ¶ 96,966 (10th Cir. 1977) (sale of liquor store where buyer received 10% of stock as indicia of ownership not within federal securities laws); *Bula v. Mansfield*, 1979 Fed.Sec.L.Rep. Transfer Binder (CCH) ¶ 96,964 (D.Colo.1977) (sale of option to buy 100% of stock from sole owner of corporation whose business was ownership and operation of a restaurant was, in economic reality, sale of option to buy restaurant and, therefore, not within federal securities laws).

Finally, the cases cited by plaintiffs in support of their "literal application" argument are inapposite. Two of the three cases cited, *Alberto-Culver Co. v. Scherk*, 484 F.2d 611 (7th Cir. 1973), *rev'd on other grounds*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974), and *Occidental Life Insurance Co. of North Carolina v. Pat Ryan & Assoc., Inc.*, 496 F.2d 1255 (4th Cir. 1974), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974), were decided before *Forman*, and are, therefore, of little precedential value. The third case, *Coffin v. Polishing Machines, Inc.*, 596 F.2d 1202 (4th Cir. 1979), *cert. denied*, 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979), although decided after *Forman*, is distinguishable from *Forman*.

In *Coffin*, the president of Polishing Machines, Inc. contacted the plaintiff and encouraged him to purchase stock in the corporation. The president stated that Polishing Machines was offering its stock in order to finance expansion. The parties reached an agreement in which the plaintiff acquired 50% of the outstanding stock of Polishing Machines and became its executive vice-president. The plaintiff thereafter discovered he had been defrauded in the transaction and sought recovery under the federal securities laws.

The Fourth Circuit reversed the district court's dismissal of the complaint for lack of subject-matter jurisdiction, holding that when "ordinary capital stock" is involved in a transaction, it is covered by the securities laws. 596 F.2d at 1204. In analyzing the transaction, the court stated:

> [T]he descriptive report supplied to Coffin during the negotiations indicates that Polishing Machines wanted to sell stock in order to finance corporate expansion. Thus, the transaction appears to be the very sort of transfer with which the federal securities laws are most concerned, "the sale of securities to raise capital for profit-making purposes." *Forman*, 421 U.S. 837, 849 [95 S.Ct. 2051, 2059].

596 F.2d at 1204.

Here, in contrast to the situation in *Coffin*, the transaction did not involve a sale of corporate stock to raise capital for profit-making purposes. The plaintiffs sought to acquire NSM's business in its entirety. The "stock" sale was a method used to vest ECC with ownership of that business. There was no offer of investment "securities". The stock of NSM merely was passed incidentally as an indicia of ownership of the

business assets sold to ECC.[2] *See Chandler,* [1979] Fed.Sec.L.Rep. Transfer Binder ¶ 96,-966, and *Bula,* [1979] Fed.Sec.L.Rep. Transfer Binder ¶ 96.964. For the above reasons, we reject the plaintiffs' "literal application" theory.

## IV

■ Plaintiffs' second argument is that the transaction here meets the requirements of a securities investment under the "economic reality" test announced in *Forman.* The "economic reality" test for determining the existence of a security involves three elements: (1) an investment in a common venture; (2) premised on a reasonable expectation of profits; (3) to be derived from the entrepreneurial or managerial efforts of others. *Forman,* 421 U.S. at 852, 95 S.Ct. at 2060. The first and third elements of this analysis are in issue here.

The first element of the "economic reality" test is whether there is an investment in a common venture. Plaintiffs argue that there was an investment in a common venture here because the employment agreement with Mr. Poloway stated that he was entitled to 20% of the gross profits of NSM, and because Mr. Poloway continued to be a shareholder in NSM, although his stock was placed in a voting trust.

■ In *Hirk v. Agri-Research Council, Inc.,* 561 F.2d 96, 101 (7th Cir. 1977), this court stated that a "sharing or pooling of funds" is required to satisfy the test for a common enterprise. Plaintiffs suggest that because Mr. Poloway received a 20% commission on NSM sales, they and Mr. Poloway "shared" their profits, and thus, there was an investment in a common enterprise. But merely stating the plaintiffs' argument reveals its hollowness. After the sale, Mr. Poloway was an employee of ECC, not a participant in an enterprise whose profits were shared.[3] The fact that an employee receives partial compensation in commissions on sales does not transform an employment contract into a securities investment.

The third element of the "economic reality" test,—that profits be derived from efforts of others—presents an even more difficult hurdle for the plaintiffs. Plaintiffs argue that they had no experience in the business of selling and servicing boats and that they relied completely on the managerial efforts and expertise of Mr. Poloway. The first problem with this argument is that it is contradicted by materials in the record on appeal.

Contrary to plaintiffs' argument, the record discloses that the plaintiffs, not Mr. Poloway, were responsible for the continued management of NSM. First, the employment agreement between ECC and Mr. Poloway stated that Mr. Poloway will:

operate within the goals, guidelines, directives, policies and procedures as communicated to Employee by Company and

---

**2.** Moreover, we note, without deciding, that the *Coffin* court's statement of the method of analysis required by *Forman* may be overly broad. The *Coffin* court stated:

Forman requires us to analyze the substance of a transaction *only* when the stocks involved do not have the "significant characteristics typically associated with the named instrument."

596 F.2d at 1204, *quoting Forman,* 421 U.S. at 851, 95 S.Ct. at 2060 (emphasis added). We are not persuaded that the cited passage supports the *Coffin* court's conclusion. Our reading of *Forman* is that an "economic reality" assessment might be required by *Forman* even if the stocks involved do have some characteristics typically associated with investment securities. As the *Forman* Court stated:

Because securities transactions are economic in character Congress intended the applica-

tion of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto.

421 U.S. at 849, 95 S.Ct. at 2059. This language implies that the "economic reality" of a transaction is always a key issue.

**3.** The employment agreement between ECC and Mr. Poloway states, in relevant part:

It shall be the duty of the Employee during the period of this agreement to devote his full time and best efforts to assist, guide and give his expertise in all areas of business in which the Company will be engaged and to operate within the goals, guidelines, directives, policies and procedures as communicated to Employee by Company and to do such other things as may be reasonably required by Company.

to do such other things as may be reasonably required by Company.

Second, in plaintiffs' motion to disqualify defendant's counsel, plaintiffs stated:

> In October of 1978 the assets of NORTH SHORE MARINE were sold to the Plaintiff corporation, EMERALD CITY. Further, NORTH SHORE MARINE entered into a management contract with EMERALD CITY CORPORATION which effectively delegated the total management and operation of the business to EMERALD CITY.

Third, in an affidavit attached to the plaintiffs' motion to disqualify defendant's counsel, Mr. Frederiksen stated:

> Affiant, as shareholder and officer of EMERALD CITY CORPORATION, has, since October of 1978, been involved in the operations of NORTH SHORE MARINE, INC.
>
> Affiant, as President of NORTH SHORE MARINE, INC., has been involved with all management decisions of NORTH SHORE MARINE since the purchase of all of the assets of said corporation of October 14, 1978.

Finally, the stock purchase and voting trust agreement provided:

> Effective upon the date hereof, Edward T. Poloway will tender his resignations as an officer and director of North Shore Marine, Inc., and will cause any and all remaining directors and/or officers to tender their resignations at the same time.

These materials in the record indicate that ECC was assuming management of NSM, not that it was relying completely on the management of Mr. Poloway.

The second problem with the plaintiffs' attempt to meet the source-of-profit requirement of the "economic reality" analysis is that the employment relationship they created with Mr. Poloway is not legally sufficient to meet that requirement. As we stated in *Emisco Industries, Inc. v.*

*Pro's, Inc.*, 543 F.2d 38, 41 (7th Cir. 1976), "[t]he important element for the transaction to constitute an investment is that [the investor] relied on present and future efforts of another to produce profits." As the Ninth Circuit stated in *S.E.C. v. Glenn W. Turner Enterprises*, 474 F.2d 476, 482 (9th Cir. 1973), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), the test for determining whether the reliance element has been met is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." Similarly, the Third Circuit has stated:

> [A]n investment contract can exist where the investor is required to perform some duties, *as long as they are nominal or limited* and would have "little direct effect upon receipt by the participant of the benefits promised by the promoters."

*Lino v. City Investment Co.*, 487 F.2d 689, 692 (3d Cir. 1973), *quoting* Sec. Act Release No. 5211 (1971) (emphasis added).

To be sure, ECC expected, and by contract required, Mr. Poloway to give his "best efforts" and "expertise" to NSM and ECC. But Mr. Poloway, as an employee, was not responsible for those "essential managerial decisions," *Turner Enterprises*, 474 F.2d at 482, affecting the conduct of the business. Indeed, Mr. Poloway's "best efforts" were specified by the employment agreement to be "within the goals, guidelines, directives, policies and procedures" of ECC.

Because ECC so strongly assumed management control when it purchased NSM, the ECC efforts were clearly not "nominal or limited," *Lino*, 487 F.2d at 692. Although ECC certainly depended on Mr. Poloway to be a good employee, the fact that plaintiffs took over and operated the business clearly demonstrates that they were not "relying" on Mr. Poloway within the concept of a securities investment.[4]

---

4. *See Emisco Industries*, 543 F.2d at 41 ("As [the buyer] planned to take over and operate the business of [the seller], it is nonsensical to say that it is depending upon [the seller's] current or future efforts to produce a profit"). *See also Schultz v. Dain Corp.*, 568 F.2d 612, 615 (8th Cir. 1978) and *Fargo Partners v. Dain Corp.*, 540 F.2d 912, 914–15 (8th Cir. 1976)

For the above reasons, we find that this matter does not properly come within the scope of the federal securities laws, under either the "literal application" or the "economic reality" theory. Thus, the district court did not have subject-matter jurisdiction and properly dismissed the two federal securities claims.[5]

## V

Plaintiffs' final argument is that the trial court erred in dismissing their pendent state and common law claims. But the plaintiffs' argument is based on their conclusion that the district court had subject-matter jurisdiction of their federal securities claims. Since we find that the district court did not have subject-matter jurisdiction, it follows that the pendent claims must also be dismissed. *See Forman*, 421 U.S. at 860 n.27, 95 S.Ct. at 2064 n.27 and *Chandler*, [1979] Fed.Sec.L.Rep. Transfer Binder (CCH) ¶ 96,966 at 96,054.

For the above reasons, the district court's dismissal of this case is

AFFIRMED.

(where buyer of apartment complex agrees that seller will manage the complex, buyer retains control and thus does not "rely" on seller within the meaning of a securities investment); and *Commander's Palace Park Assoc. v. Girard & Pastel Corp.*, 572 F.2d 1084, 1086 (5th Cir. 1978) (where purchaser bought and leased back mobile home park, and seller undertook substantial responsibilities, because seller's efforts alone were not the "crucial" efforts, the buyer did not "rely" within the meaning of a securities investment).

5. Because we find that this matter does not come within the scope of the federal securities laws, we do not reach the defendant's alternate theories that plaintiffs failed to plead fraud with the requisite specificity and that Mr. Frederiksen is not a proper party to this action.