Arthur **GOLDEN** and **Gladys Golden**, Plaintiffs,

v.

Anthony **GARAFALO**, Defendant.

No. 81 Civ. 1987 (WCC).

United States District Court,
S. D. New York.

Aug. 31, 1981.

Kass, Goodkind, Wechsler & Labaton, New York City, for plaintiffs; Edward Labaton, John H. Riley, Richard Rosenblum, New York City, of counsel.

Warshaw, Burstein, Cohen, Schlesinger & Kuh, New York City, for defendant; William B. Aronstein, Milton Waxenfeld, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

Before the Court is the motion of defendant to dismiss the complaint for lack of jurisdiction over the subject matter, pursuant to Rule 12(b)(1), F.R.Civ.P. The issue presented is whether, after the decision of the United States Supreme Court in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975), the transfer of total ownership and control of a privately owned and operated business, accomplished by a sale of 100% of the stock of the corporation from defendant to plaintiffs, involves the purchase of a "security" under the Securities Act of 1933 ("1933 Act") and the Securities Exchange Act of 1934 ("1934 Act"). For the reasons which follow, the Court concludes that, on the facts of this case, it does not, and accordingly grants defendant's motion.

### Background

This dispute centers around the transfer from defendant to plaintiffs of Mackey's Inc. ("Mackey's"), a ticket brokerage business. Prior to the transfer defendant owned 100% of the outstanding stock of Mackey's and was its Chief Operating Officer. Plaintiffs are engaged in the ticket brokerage business, and in or about November-ber 1980 reached agreement generally with defendant for the purchase of Mackey's. The attorneys for the parties—the same attorneys who are appearing in this action—then entered into discussions as to how to structure the transaction; *e. g.*, as a sale of assets or a sale of stock. Because the lease of the premises where Mackey's conducts business placed restrictions on any assignment of or subletting under the lease, it was agreed that the transfer would be structured as a purchase and sale of the stock of Mackey's.

A written agreement was signed on December 31, 1980. In it the purchase price of the stock is defined as an amount equal to the "Net Assets" of Mackey's, as defined in the agreement, plus $108,296. The purchase price is payable in three installments, the last two evidenced by promissory notes. The agreement provides for the transfer to plaintiffs of the resignation of all existing officers and directors of Mackey's, as well as its books and records, lease and contracts. By the agreement, defendant is prohibited from directly or indirectly engaging in any capacity in the ticket brokerage business in the United States for a period of five years.

The parties simultaneously executed a consulting agreement, which recites that defendant has sold his interest in Mackey's and is no longer employed by Mackey's; that defendant agrees to provide consulting and advisory services to Mackey's upon reasonable request for a fee of $100 per day; and that defendant is an independent contractor and not an employee of Mackey's.

Finally, also on December 31, 1980, counsel for plaintiffs wrote to defendant's attorney, confirming the agreement that "the new owners will have full operational control of the business and may change currently existing practices and policies."

### The Lawsuit

Plaintiffs claim that defendant has made material misstatements, both in the contract of sale and in negotiations preceding the contract, regarding Mackey's, including the volume and nature of Mackey's sales.

The complaint is in five counts. The first count alleges violation of Section 17(a) of the 1933 Act, and Rule 10b–5, promulgated pursuant to Section 10(b) of the 1934 Act, and seeks rescission of the contract. Counts two through five are based upon the same factual allegations and plead claims of common law breach of contract, common law fraud, violation of a state securities statute and common law breach of the restrictive covenant agreement, respectively. Compensatory and punitive damages, as well as equitable relief, are sought. No diversity of citizenship exists, and thus jurisdiction over the latter four claims depends upon the application of principles of pendent jurisdiction.

*The Motion*

Defendant argues that the subject of the agreement between the parties was the outright sale of Mackey's, in which the purchase of stock was a mere indicium of ownership, and thus that the transaction did not involve the purchase of a "security" triggering application of the 1933 and 1934 Acts. Thus, argues defendant, there is no federal question presented and no basis for the exercise of pendent jurisdiction over the state law claims.

*Forman*

As indicated above, resolution of the issue in this case turns upon the proper interpretation to be given to the Supreme Court's decision in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). In *Forman*, residents of a state subsidized and supervised nonprofit low-income housing cooperative were required to purchase shares of stock in order to acquire their apartments. The sole purpose of acquiring the stock was to enable the purchaser to occupy an apartment, the number of shares being proportionate to the number of rooms in an apartment. The stock could not be transferred to a nontenant pledged or encumbered. Each apartment owner was entitled to one vote, regardless of the number of shares held. Any tenant terminating his occupancy had to resell the stock back to the issuer at its initial selling price, or, under limited circumstances, sell to a qualifying replacement tenant at virtually the same price.

The question before the Court was whether the shares of stock held by the housing cooperative residents were "securities" under the 1933 and 1934 Acts. The definitional sections of the Acts [1] define a "security" as "any . . . stock, . . . [or] investment contract . . . ," "unless the context otherwise requires." The Court of Appeals had found the "stock" in *Forman* to be securities both because it was denominated "stock" and because it possessed the charac-

---

1. Section 2(1) of the 1933 Act defines a "security" as

"unless the context otherwise requires—. . . any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

Section 3(a)(10) of the 1934 Act defines "security" as

"unless the context otherwise requires—. . . any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

In *Forman*, the Court indicated that, "for present purposes the coverage of the two Acts may be considered the same." *Id.* 421 U.S. at 847 n.12, 95 S.Ct. at 2058 n.12.

teristics of an investment contract. The Supreme Court reversed, holding that

> "[w]ell-settled principles enunciated by this Court establish that the shares purchased by respondents do not represent any of the 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits,' [*SEC v. W. J. Howey Co.*, 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946)], and therefore do not fall within the 'ordinary concept of a security.'" *Id.* at 848, 95 S.Ct. at 2058.

The Court began its analysis by rejecting the proposition that the use of the term "stock" automatically qualified the shares as securities under the Acts. Quoting from its previous opinion in *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1977), the Court reiterated

> "the basic principle that has guided all of the Court's decisions in this area:
>
>> '[I]n searching for the meaning and scope of the word "security" in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality.'
>
> "The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors. Because securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto. Thus, in construing these Acts against the background of their purpose, we are guided by a traditional canon of statutory construction:
>
>> '[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.' *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459 [12 S.Ct. 511, 512, 36 L.Ed. 226] (1892)."

*Forman, supra*, at 848–49, 95 S.Ct. at 2058–59.

The Court did caution that

> "[i]n holding that the name given to an instrument is not dispositive, we do not suggest that the name is wholly irrelevant to the decision whether it is a security. There may be occasions when the use of a traditional name such as 'stocks' or 'bonds' will lead a purchaser justifiably to assume that the federal securities laws apply. This would clearly be the case when the underlying transaction embodies some of the significant characteristics typically associated with the named instrument." *Id.* at 850–51, 95 S.Ct. at 2059–60.

However, the Court found no basis for any argument that the purchasers in *Forman* were misled by the use of the word "stock." The Court identified the following five "common features of stock" which the shares purchased by the cooperative tenants lacked—

(1) the right to receive dividends contingent upon an apportionment of profits,

(2) negotiability,

(3) the ability to be pledged or hypothecated,

(4) voting rights in proportion to the number of shares owned, and

(5) the potential to appreciate in value—

and concluded that "[i]n short, the inducement to purchase was solely to acquire subsidized low-cost living space; it was not to invest for profit." *Id.* at 851, 95 S.Ct. at 2060.

The Court then turned its attention to the alternative ground of the Court of Appeals decision that the shares were securities; *i. e.*, that they constituted an "investment contract." In *Howey, supra*, the Court had set down the following test for determining whether shares in an enterprise constitute an "investment contract":

> "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely

from the efforts of others." *Id.* 328 U.S. at 301, 66 S.Ct. at 1104.

In *Howey*, the Court had held that an interest in an enterprise which satisfies this test is an "investment contract" (and thus a "security"), "it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." *Id.* at 299, 66 S.Ct. at 1103.

In *Forman*, the Court's application of the *Howey* test to the facts before it was previewed by the following discussion:

"We perceive no distinction, for present purposes, between an 'investment contract' and an 'instrument commonly known as a "security." ' In either case, the basic test for distinguishing the transaction from other commercial dealings is [the *Howey* test]. This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, as in *Joiner, supra* [320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88] (sale of oil leases conditioned on promoters' agreement to drill exploratory well), or a participation in earnings resulting from the use of investors' funds, as in *Tcherepnin v. Knight, supra* (dividends on the investment based on savings and loan association's profits). In such cases the investor is 'attracted solely by the prospects of a return' on his investment. *Howey, supra* [328 U.S.] at 300 [66 S.Ct. at 1103]. By contrast, when a purchaser is motivated by a desire to use or consume the item purchased—'to occupy the land or to develop it themselves,' as the *Howey* Court put it, *ibid.*—the securities laws do not apply." *Id.* 421 U.S. at 852–53, 95 S.Ct. at 2060–61.

The Court concluded that the purchase of the shares in *Forman* fell short of qualifying as a security, the sole purpose being a purchase of living quarters for personal use and not an investment in the hope of receiving profits from the efforts of others. *Id.* at 858, 95 S.Ct. at 2063.

*Discussion*

Defendant contends that, after *Forman*, inquiry into whether an interest is a security requires looking beyond the formal appearance of the interest and applying the "economic reality" test. Defendant argues also that the "economic reality" test is the three-part test originally set forth in *Howey* and utilized in *Forman; i. e.*, a security is (1) an investment in a common venture (2) premised on a reasonable expectation of profits (3) to be derived from the entrepreneurial or managerial efforts of others. Here, contends defendant, plaintiffs purchased an entire business for their own control and operation, thus failing to satisfy the first and third elements of the test.

A number of post-*Forman* decisions have so ruled. In *Chandler v. Kew, Inc.*, [1979] Fed.Sec.L.Rep. (CCH) ¶ 96,966 (10th Cir. 1977), the court, applying the *Forman* economic reality test, found that the transfer of stock merely as an indicium of ownership in the sale of a liquor store did not involve the sale of a security within the meaning of the federal Acts, which were designed to regulate stock exchanges and public investments, not the mere transfer of stock incidental to the sale of tangible goods.

Similarly, in *Bula v. Mansfield*, [1979] Fed.Sec.L.Rep. (CCH) ¶ 96,964 (D.Colo. 1977), the court dismissed federal securities laws claims by a purchaser of 100% of the stock of a restaurant, finding that (1) the economic reality was the purchase of a restaurant, and (2) since the purchaser was to assume managerial control over the restaurant, there was no reliance upon the efforts of others, the third aspect of the test set forth in *Howey* and *Forman*.

In *Dueker v. Turner*, [1979] Fed.Sec.L. Rep. (CCH) ¶ 97,386 (N.D.Ga.1979), the court, applying the *Howey-Forman* economic reality test, dismissed securities laws claims by purchasers of all of the stock of a

general contracting business, finding that the reality of the transaction was the acquisition of a business by the plaintiffs for their managerial control.

In *Frederiksen v. Poloway*, 637 F.2d 1147 (7th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981), the plaintiff (an individual acting in his capacity as president of a corporation) purchased all of the assets and stock of a boat marina from the defendant. The plaintiff also contracted for the defendant's consulting services in the operation of the marina for five years, in exchange for an annual salary, a consulting fee and commissions on certain sales. A separate agreement vested authority to operate and manage the marina with the plaintiff. Finding that the transaction was for the commercial purpose of acquiring a business and not for the purpose of investment, the court rejected the plaintiff's claim that the acquisition of the stock constituted a purchase of a security. Since the plaintiff acquired complete ownership and control of the marina, the court found both the first and third elements of the *Howey-Forman* economic reality test lacking. The court found immaterial the employment contract with the defendant, since it was clear that the plaintiff had assumed managerial control over the marina.

In *Barsy v. Verin*, 508 F.Supp. 952 (N.D. Ill.1981), the parties were two operators of a printing business who, in combination, owned 92% of the stock of the business. They, along with the third stockholder, sold the business to a third party by means of a transfer of all of the stock. Following *Frederiksen*, the court rejected the federal securities laws claims, finding the economic reality of the sale to have been the wholesale transfer of a business and not an investment transaction. That defendant continued in the business as an employee did not alter the court's conclusion that it was the purchaser who assumed managerial control of the business.

In *Anchor-Darling Industries, Inc. v. Suozzo*, 510 F.Supp. 659 [Current] Fed.Sec. L.Rep. (CCH) ¶ 97,933 (E.D.Pa.1981), the plaintiff purchased the defendant's controlling stock of three closely held corporations and the remaining shares of these corporations from the defendant's daughters and certain employees of the corporations. The transaction was designed to effect the parties' agreement to transfer the defendant's business in its entirety to the plaintiff. The plaintiff thus assumed complete control over the operation of the corporations, although the defendant did enter into consulting agreements with the corporations. Applying the three-part "economic reality" test of *Howey* and *Forman*, the court dismissed the securities laws claim, finding the first and third components absent on the facts presented.

Finally, in *Reprosystem, B. V. v. SCM Corp.*, —— F.Supp. —— [Current] Fed.Sec. L.Rep. ¶ 98,207 (S.D.N.Y.1981), Judge Sweet of this Court, following *Frederiksen*, refused to apply the federal securities laws to a purchase and sale of a business, even though that purchase and sale in part involved a transfer of ownership evidenced by stock.

Plaintiffs, with one exception not meriting discussion, make no attempt to distinguish the factual situations involved in these decisions from the circumstances here. Nor do they contest that their purchase of all of the stock of Mackey's fails to satisfy the first and third elements of the *Howey-Forman* test. Instead, plaintiffs argue that defendant's position and authorities are premised upon a misreading of *Forman*.

Relying upon the separate itemization of "stock" and "investment contract" within the Acts' definition of a security, plaintiffs argue that *Forman* should be read to have held:

(1) that the shares there were not "stock" because they lacked the five common features of stock identified above, and

(2) that the shares there were not "investment contracts" because they failed to satisfy the second, "investment for profit" element of the three-part test originally set forth in *Howey*. Thus, argue plaintiffs, *Forman* requires a two-step analysis, and the three-part "economic reality" test, which is applicable only to the definition of

an investment contract, is irrelevant where the interest in question meets the criteria of "stock" set forth in the first step of the *Forman* analysis. Since here, the argument continues, the shares in question undisputably possess the five common features of stock specified in *Forman*, they are "stock" within the Acts' definition of a security, and it is irrelevant that they are not also "investment contracts."

Plaintiffs rely upon four post-*Forman* decisions. In *Bronstein v. Bronstein*, 407 F.Supp. 925 (E.D.Pa.1976), the plaintiff and the defendant were brothers who along with their father, each held one-third of the stock of a corporation. The defendant handled all of the corporation's financial matters; the plaintiff was employed as a "field supervisor" in charge of construction activities, and relied completely upon the defendant for information concerning the corporation's financial status and the value of its assets. The claim arose following the plaintiff's sale of his stock to the defendant. In ruling that the stock sold by the plaintiff to the defendant was a security, the court reasoned (1) that since the shares possessed the common features of stock, this was a situation, alluded to in *Forman*, where the traditional label and form itself supported the finding of a security in order to protect the purchaser's or seller's reasonable expectations, and (2) *Forman* requires application of the test formulated in *Howey* only in determining whether an ownership interest is an investment contract, and not to an examination of whether such an interest is stock.

In *Titsch Printing, Inc. v. Hastings*, 456 F.Supp. 445 (D.Colo.1978), the plaintiff purchased all of the shares of two corporations from the defendants. In ruling that the shares were stock within the definition of a security, the court found (1) that the shares possessed the common features of stock, (2) that, distinguishing *Chandler, supra*, the shares were not a mere indicium of ownership but were rather the substance of the purchase itself, since the corporate structure was used to direct additional business enterprises, and (3) that *Forman* did not require application of the *Howey* test to stock.

In *Coffin v. Polishing Machines, Inc.*, 596 F.2d 1202 (4th Cir.), *cert. denied*, 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979), the plaintiff purchased 50% of the shares of the defendant and became its executive vice president. The district court, relying on *Forman*, found that the transaction did not involve a security. Since the plaintiff was to contribute substantially to the management of the corporation, the transaction did not meet the third aspect of the test derived from *Howey*. The Court of Appeals reversed, reading *Forman* as requiring application of the *Howey* test only when the stock involved lacks the significant characteristics typically associated with the named instrument. The court also noted that the defendant sold the stock in order to finance corporate expansion, and thus the transaction—a sale of securities to raise capital for profit-making purposes—"appears to be the very sort of transfer with which the federal securities laws are most concerned." *Id.* at 1204.

And in *Miflin Energy Sources, Inc. v. Brooks*, 501 F.Supp. 334 (W.D.Pa.1980), the court ruled that the purchase of all of the shares of a corporation was the purchase of a security. Since the shares possessed the common features of stock, the court reasoned, *Forman* did not require application of the economic reality test. The court also distinguished *Chandler, supra, Bula, supra*, and *Dueker, supra*, as cases involving the purchase of a business to which the stock was a mere indicium of ownership; the court found the substance of the transaction before it to be the transfer of the stock, with the ownership of the business a byproduct of the stock transfer.

Plainly the post-*Forman* decisions relied upon by the parties differ markedly over the proper interpretation to be given *Forman*. The issue is whether *Forman* adopts the *Howey* test as a general "economic reality" test to be applied to all purported securities, or whether *Forman* requires that instruments labelled or characterized as "stock" need only possess certain features

commonly associated with stock instruments to come within the ambit of the federal Acts. In my view, the former reading of *Forman* is the correct one. Several considerations point in this direction.

First, the *Forman* Court strongly, if not unequivocally, indicated that the three-pronged *Howey* test was to be broadly utilized in determining whether any interest is a security. The Court capsulized its analysis by equating "the ordinary concept of a security" with the *Howey* formulation of " 'schemes devised by those who seek the use of the money of others on the promise of profits.' " *Forman, supra,* 421 U.S. at 848, 95 S.Ct. at 2058, quoting from *Howey, supra,* 328 U.S. at 299, 66 S.Ct. at 1103. And later, in discussing the *Howey* test, the Court noted that there is no distinction between an "investment contract" and an "instrument commonly known as a security." *Id.* 421 U.S. at 852, 95 S.Ct. at 2060. Finally, the Court specifically stated that the *Howey* test, "in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security . . . . [W]hen a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply." *Id.* at 852–53, 95 S.Ct. at 2060–61.

Second, the emphasis which plaintiffs place upon the absence of common features of stock in the *Forman* shares is misplaced. The context of that discussion in *Forman* was as an exception to the economic reality approach; the Court merely cautioned that the form of an interest may be material where it would lead a purchaser or seller reasonably to believe the securities laws would apply. In *Forman,* the Court concluded that the tenants-purchasers could not have reasonably relied upon the coverage of the Acts because, as evidenced by the absence of the common features of stock, the purchases were solely to acquire housing and not to invest for profit. *Id.* at 851, 95 S.Ct. at 2060. Furthermore, the scenario in *Forman* was one of many apparently unsophisticated purchasers contemplating an acquisition of "stock," and it is in that context that the Court warned that shares having the common features of stock

may lead purchasers reasonably to rely upon the applicability of the federal securities laws.

Here, by comparison, despite the presence of the common features of stock in the transferred shares, there was manifestly no reasonable reliance by plaintiffs upon coverage by the Acts. The undisputed facts indicate that the concern of the parties was the transfer of a business, not the sale and purchase of stock. That the deal took the form of a stock transfer was merely a technicality dictated by a provision in a lease. Plaintiffs were certainly not misled as to the reality of the transaction by the form which it took. Furthermore, plaintiffs were represented throughout by able counsel, and negotiated and executed the agreement after the Court's decision in *Forman* and after several lower federal courts had specifically ruled against plaintiffs' position here. In short, this is not a case where the economic reality approach should be compromised because of the reasonable expectations of the plaintiffs.

Third, the approach urged by plaintiffs is inconsistent with the entire thrust of *Forman.* *Forman* teaches the disregard of form for economic substance. *Id.* at 848, 95 S.Ct. at 2058. As applied to the facts of *Forman,* that principle impelled the rejection of coverage under the Acts of shares simply because they carried the name of "stock." Here, to read *Forman* as endorsing application of the Acts to every acquisition which possesses the common features of stock, without regard to the economic reality of the underlying transaction, would be to retreat from the *Forman* principle and merely to substitute an alternative formal test for the one rejected by the *Forman* Court. *Forman* mandates that courts look harder at purported securities transactions before extending the securities laws to cover such transactions. And while it is no doubt true, as plaintiffs suggest, that adherence to the economic reality test may be more difficult in practice than a formal approach which automatically confers the status of a security upon shares exhibiting the common features of stock, *Forman* may

be fairly regarded as having nevertheless struck the balance in favor of a more precise delineation of those transactions truly covered by the Acts.

Fourth, the *Forman* decision was plainly grounded upon an attempt to restrict application of the Acts to their intended scope; *i. e.,* "the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors." *Forman, supra* at 849, 95 S.Ct. at 2059. That approach is consistent with the definitional sections of the Acts, which define a security as any stock "unless the context otherwise requires." Here, where the reality of the transaction was the sale of an entire small business to be operated by the purchaser, the protective purpose of the federal legislation is not implicated. Here there is no publicly traded security nor any passive investor entrusting his capital to another in hopes of profit. To apply the federal securities laws to such a transaction simply because of the incidental transfer of stock would bring within the ambit of the Acts the transfer of any conceivable item, as long as the deal was structured as the purchase and sale of the stock of a corporation holding that item as an asset, even if the corporation held no other assets. The federal securities laws were not designed to usurp the common law where the reality of the transaction is the transfer of a tangible item for the use of the purchaser. *Forman, supra* at 852–53, 95 S.Ct. at 2060–61.

Fifth, as applied to the facts in this case, the post-*Forman* decisions are uniformly in accord with the result reached here. In *Chandler, supra, Bula, supra, Dueker, supra, Frederiksen, supra, Anchor-Darling, supra,* and *Reprosystem, supra,* as here, the plaintiffs purchased 100% of the stock of, and assumed complete control over, a business, under circumstances unequivocally indicating that the essence of the transaction was the purchase of a business, with the transfer of stock a mere indicium of ownership. Under such circumstances, each court found lacking under the economic reality test the indicium of an investment as distinguished from a commercial acquisition; *i. e.,* the anticipation of profits to be derived from the entrepreneurial or managerial efforts of others.

By contrast, the authorities relied upon by plaintiffs are inapposite. In both *Bronstein, supra,* and *Coffin, supra,* the plaintiff acquired neither complete ownership nor complete control of the business in question; in both cases the purchase arguably had the characteristics of an investment. And in both *Titsch, supra,* and *Miflin, supra,* the courts specifically distinguished this case and certain of the decisions relied upon by defendant by finding that the reality of the transactions was the purchase and sale of stock, with the acquisition of a business being incidental thereto. Thus, while each of these opinions suggests a reading of *Forman* at odds with the interpretation of this court and of defendant's authorities, the specific results in these four decisions are not necessarily inconsistent with either the decision here or with the general application of the economic reality test.

Accordingly, the Court concludes that the shares purchased by plaintiffs here were not securities within the ambit of the federal Acts. No federal claim being presented, the first count of the complaint must be dismissed. There is no diversity of citizenship between the parties, and the exercise of jurisdiction over the remaining state and common law claims would be inappropriate, *Forman, supra* at 860 n.27, 95 S.Ct. at 2064 n.27, and counts two through five must also be dismissed.

*Conclusion*

Defendant's motion to dismiss the complaint is granted.

SO ORDERED.