**Solbert J. BARSY, Plaintiff,**

v.

**Bernard D. VERIN, Defendant.**

**No. 79 C 3323.**

United States District Court,
N. D. Illinois, E. D.

Feb. 25, 1981.

Jack Joseph, Ira J. Friedman, Daniel B. Glickstein, Joseph & Friedman, Chicago, Ill., for plaintiff.

Ron Rassin, Fink, Coff, Stern & Baron, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff, Solbert J. Barsy ("Barsy"), brought this action alleging in a two-count complaint that defendant, Bernard D. Verin ("Verin"), had violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.-10b–5, promulgated thereunder (Count I) and that Verin had breached his fiduciary duty and committed other common law wrongs cognizable under state law (Count II) in connection with the sale of Chicago

Aligraphy and Lithographing Corporation ("Aligraphy") to Monarch Printing Corporation ("Monarch") in October, 1978.[1] Verin has answered the complaint and filed a four-count counterclaim charging Barsy with various breaches of fiduciary duty in connection with the sale of their Aligraphy stock to Monarch. Jurisdiction over the securities law claims is asserted under section 27 of the 1934 Act, 15 U.S.C. § 78aa, which vests exclusive jurisdiction over claims arising under the Act in the federal courts. The claims arising under state law are brought pursuant to the doctrine of pendent jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); S. Schenkier, *Ensuring Access to Federal Courts: A Revised Rationale for Pendent Jurisdiction*, 75 Nw.U. L.Rev. 245 (1980). Presently before the Court are the parties' cross-motions for summary judgment, each asserting that the other has failed to state a claim upon which relief can be granted and that, in the absence of any disputed material facts, he is entitled to judgment as a matter of law. Fed.R.Civ.P. 12(b)(6); 56(c).

██ At the outset, the Court notes that although neither party has raised the question of our jurisdiction over the subject matter of this lawsuit, "Rule 12(h)(3) permits a court to dismiss an action *sua sponte* when the court determines it lacks subject matter jurisdiction." *Choudhry v. Jenkins*, 559 F.2d 1085, 1091 (7th Cir. 1977); Fed.R. Civ.P. 12(h)(3). As the court noted in *Choudhry*, "we must not cavalierly overlook the one specie of Rule 12 motion that can be made by the court on its own motion." *Id.* Since we find that this case falls squarely within the rule recently enunciated by the United States Court of Appeals for the Seventh Circuit in *Frederiksen v. Poloway*, 637 F.2d 1147 (7th Cir. 1981), that the acquisition of control of a corporation in a transaction in which the purchaser assumes the day-to-day management of the company

does not constitute a "securities" transaction within the meaning of the federal securities laws even though it technically involves the transfer of shares of stock, the Court will dismiss Barsy's purported federal claims along with the pendent state claims and Verin's counterclaims for lack of subject matter jurisdiction. As the court of appeals recognized in *Frederiksen*, claims such as those asserted in the case at bar are properly the subject of a state court suit and they do not become cognizable under the federal securities laws merely because somewhere down the line there was a purchase or sale of stock.

## FACTS

Barsy and Verin are both residents of the State of Illinois. For many years, Verin ran several small printing businesses and though he hoped to expand, he lacked the financial resources to undertake such a venture on his own. Verin and Barsy became acquainted through their mutual friend, Hyman Krauss, an attorney, and in mid-1969 after some preliminary discussions they organized Aligraphy under the laws of the State of Illinois. Barsy contributed the bulk of the capital and loans totalling $125,-000 to the new corporation in exchange for 500 of the 1,000 shares issued upon incorporation. Verin contributed his printing business consisting of three corporations[2] and a $25,000 short term loan in exchange for 416⅔ shares of Aligraphy stock. Krauss received the remaining 83⅓ shares. Verin became president and chief executive officer of Aligraphy and Krauss was named secretary. The corporation initially had four directors: Barsy, Verin, Krauss, and Barsy's wife, Bia. Although Barsy and Krauss left the day-to-day operation of the business to Verin, Barsy and Verin met weekly from June, 1969, to November, 1976, to discuss the business over lunch, usually at the Palmer House Hotel in Chicago.

1. Barsy and Verin owned approximately 92% of the outstanding shares of Aligraphy at the time of the sale. The remaining shares, owned by a third person, Mrs. Frances Krauss, were also sold to Monarch at the same time.

2. Krauss had a fifty percent financial interest in one of these corporations.

In late 1976 the relationship between Barsy and Verin began to sour, however, and it subsequently became apparent that they would be unable to continue together in Aligraphy. The parties have related their respective views on the cause and extent of their disagreement in great detail each accusing the other, in effect, of bad faith. Barsy contends that Verin had been harboring a grudge for the past seven years with regard to the organization of the business and their respective shares of the earnings and profits. Verin, on the other hand, contends that he was concerned about the absence of an assurance that Barsy would only control fifty percent of the board of directors after Krauss' death[3] and that distribution of the earnings and profits was inconsistent with the original agreement between the parties. In any event, Barsy and Verin ceased their weekly luncheon meetings in November, 1976, and Verin continued to run the business as they tried to work out a mutually agreeable way of settling their differences, either by reorganizing the company or through some sort of a buy-out arrangement. Meanwhile, Krauss died in April, 1977, leaving his Aligraphy shares to his widow, Frances, who apparently indicated that she did not intend to act to the detriment of either Barsy or Verin and that she would go along with any plan they developed to resolve their differences. Krauss Affidavit at ¶ 8.

Finally, in July, 1978, Verin wrote to Barsy reiterating his continued dissatisfaction with the business and suggesting that they sell their interests to a third party, Monarch, who had expressed an interest in acquiring Aligraphy's accounts and employing Verin as a salesman.[4] In the following months, Barsy and Verin conducted separate negotiations with Herbert Hansen, president of Monarch, regarding the sale of their Aligraphy stock. Each was aware that the other was negotiating with Han-

---

3. Krauss' death left Barsy in control of two of the three remaining seats on the Aligraphy board. The composition of the board was formally changed from four to three on Barsy's motion in January, 1978.

4. It should be noted that the only connection with interstate commerce in this case is this July 6, 1978, letter from Verin to Barsy and a subsequent phone conversation between the parties a few days later in which they discussed the possibility of selling their Aligraphy stock to Monarch. Both communications were wholly intrastate and they occurred before the start of any negotiations for the sale of the stock. Had Barsy and Verin acted in accordance with their past practice of discussing business over their weekly lunch at the Palmer House, there would be no connection whatsoever with interstate commerce and this Court would lack subject matter jurisdiction over this case. Although quite a few courts have held that wholly intrastate letters or telephone calls satisfy the jurisdictional requirements of section 10(b), *Spilker v. Shayne Laboratories*, 520 F.2d 523 (9th Cir. 1975); *Aquionics Acceptance Corporation v. Koller*, 503 F.2d 1225 (6th Cir. 1974); *Dupuy v. Dupuy*, 511 F.2d 641 (5th Cir. 1974); *Kerbs v. Fall River Industries, Inc.*, 502 F.2d 731 (10th Cir. 1974); *Lawrence v. Securities and Exchange Commission*, 398 F.2d 267 (1st Cir. 1968); *Myzel v. Fields*, 386 F.2d 718 (8th Cir. 1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Harrison v. Equitable Life Assurance Society of United States*, 435 F.Supp. 281 (W.D.Mich.1977); *Starck v. Dewane*, 364 F.Supp. 466 (N.D.Ill.1973); *Nem-itz v. Cunny*, 221 F.Supp. 571 (N.D.Ill.1963), the Seventh Circuit has expressly declined to take a position on the question, *Hidell v. International Diversified Investments*, 520 F.2d 529, 536–37 n.15 (7th Cir. 1975). *See also Arber v. Essex Wire Corp.*, 342 F.Supp. 1162, 1163–64 (N.D.Ohio 1971); *Rosen v. Albern Color Research, Inc.*, 218 F.Supp. 473, 475–76 (E.D.Pa. 1963) (holding that local telephone calls are inadequate to satisfy jurisdictional requisite of interstate commerce). The absurdity of holding that the jurisdictional requirement is satisfied by the minimal intrastate use of the instrumentalities of interstate commerce in the present case is self-evident. Even if we were to assume, however, that the jurisdictional requisite is satisfied by Verin's letter and phone call to Barsy, "[t]here must be some connection between the communication and the fraud." *Harrison v. Equitable Life Assurance Society of United States, supra*, 435 F.Supp. at 284. In the instant case, there is only the most tenuous connection at best between the letter and phone call and the alleged fraudulent activity, some of which supposedly occurred before the letter was written and as a result of the subsequently executed employment and override agreements between Verin and Monarch. Accordingly, in the circumstances of this case, we would be inclined to hold that the interstate commerce requirement for jurisdiction under section 10(b) has not been met. However, we need not reach that issue as the case can be disposed of on other grounds.

sen, who apparently was only interested in the deal if he could purchase all of the outstanding stock in Aligraphy in order to assume complete control of that company and its accounts. *See* Barsy Affidavit at ¶ 26; Verin Affidavit at ¶ 12; Hansen Deposition at 13 (set forth as Exhibit E–2 to Verin Affidavit).

All the parties finally reached an acceptable agreement in the fall of 1978. Barsy closed the sale of his Aligraphy stock to Monarch on or about October 5, 1978. Verin closed his sale approximately one week later on or about October 12. Under the terms of the agreements, Barsy received $200,000 for his 50% interest in Aligraphy plus an override of two percent of the sales by Monarch over a five-year period to certain named accounts of Aligraphy other than those that had been serviced by Verin. For his approximately 42% of the company, Verin received $175,000 plus an override of .25 percent of the sales on the same accounts on which Barsy received an override.[5] Verin also negotiated a five-year

employment agreement with Monarch for a base salary of $75,000 per year plus 10% of the sales to customers serviced by him in excess of $1,000,000 per year.[6] When Barsy discovered the terms of Verin's agreement with Monarch, he filed this lawsuit alleging that Verin had violated the securities laws by failing to disclose to the other Aligraphy shareholders that he was receiving a "premium" for his stock that should have inured to the benefit of all Aligraphy shareholders, including Barsy. Barsy alleged that the premium was disguised as compensation to Verin for work as a salesman for Monarch. Barsy also alleged that Verin had committed common law fraud and breached his fiduciary duty to the corporation and to Barsy by obtaining such a premium, and by withdrawing money from Aligraphy without authorization from the board, appropriating the various corporate benefits for himself, and failing to disclose the true value of the company to Barsy so that he could receive a fair price for his share of Aligraphy.[7]

---

5. Mrs. Krauss also sold her shares of Aligraphy stock to Monarch at this time. She received $25,000 in cash and .25% of the sales by Monarch over a five-year period to certain named accounts of Aligraphy other than those serviced by Verin. Each of the sales agreements with Monarch was expressly contingent upon the closing of the other transactions so that Monarch would be assured complete ownership of Aligraphy. *See, e. g.*, paragraph 5(g) of the stock purchase agreement between Monarch and Verin attached as Exhibit H to Defendant's Memorandum in Support of Summary Judgment.

6. Verin's salary at Aligraphy had been $58,825 plus $5,000 in non-business expenses plus possible bonuses.

7. Even a cursory review of the several hundred pages of briefs filed by the parties in this action reveals that although Count I of the complaint purportedly alleges a nondisclosure in violation of the securities laws, the case basically revolves around the allegations of common law fraud and breach of fiduciary duty in Count II cognizable in state court. Barsy makes only scant reference to the elements of a section 10(b) cause of action, citing virtually no case authority in support of Count I of his complaint and preferring instead to concentrate on the Illinois law of fiduciary duties of corporate officers and shareholders. Verin hardly addresses the securities law claims in his memoranda and

when he does consider the subject it is only to put forth the limited argument that since he technically closed his sale to Monarch after Barsy, any boot or premium he received in connection with such sale did not exist and hence was not material as that term is used in connection with the federal securities laws at the time of Barsy's transaction.

The Supreme Court has recognized that a plaintiff may not bootstrap his way into federal court merely by alleging the defendant's failure to disclose his violations of state fiduciary duty law. In *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court held that a complaint alleging the failure to disclose the unfairness of a particular transaction, corporate mismanagement, or breach of fiduciary duty without some affirmative showing of manipulation, deception, misrepresentation, or nondisclosure of material facts failed to state a cause of action under section 10(b) or Rule 10b–5. In part IV of its opinion, the Court went on to state some "additional considerations that weigh heavily against permitting a cause of action under Rule 10b–5 for the breach of corporate fiduciary duty...." 430 U.S. at 477, 97 S.Ct. at 1302. The Court noted that the purpose of the securities laws was to ensure full and fair disclosure to investors in securities, and that once such disclosure of the underlying facts and circumstances was made the fairness of the transac-

## SUBJECT MATTER JURISDICTION

However broad the scope of the federal securities laws, this surely is a case that falls outside their expansive boundaries. In *Frederiksen v. Poloway*, 637 F.2d 1117 (7th Cir. 1981), the Seventh Circuit significantly limited the sweep of the federal securities laws with regard to alleged fraud in the sale of all the stock in a corporation to a purchaser who thereby acquires control of the day-to-day operation of the business. The court held that the purchase of stock yielding control of the "critical decisions" of the corporation did not constitute a transaction in securities within the context of the federal securities laws. In such a situation, the court found that the transaction was motivated by a commercial rather than an investment purpose and that only transactions falling in the latter category merit the protection afforded by the securities laws. *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975).

In *Frederiksen*, the plaintiff had purchased the stock and assets of a small, closely held corporation from the defendant who had been the sole shareholder in the company. The defendant entered into an employment agreement with the plaintiff who assumed control of the corporation. The plaintiff subsequently filed suit in federal court alleging that the defendant had failed to disclose or misrepresented material facts in connection with the sale in violation of the federal securities laws. He also asserted pendent claims for common law fraud and breach of contract. Judge Sprecher, writing for the court, looked to the economic reality of the transaction—

rather than literally applying the language of the securities laws in accordance with the Supreme Court's rationale in *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975)— and concluded that the transaction did not satisfy the requirements of a securities investment.[8] The parties were thus relegated to state court for the resolution of their common law claims. The court cited with approval the decisions of other courts that had refused to extend the federal securities laws to what were essentially commercial sales transactions that happened to involve the transfer of stock as an indicia of ownership of a business. *Chandler v. Kew, Inc.*, CCH Fed.Sec.L.Rep. [1979] Transfer Binder ¶ 96,966 (10th Cir. 1977); *Bula v. Mansfield*, CCH Fed.Sec.L.Rep. [1979] Transfer Binder ¶ 96,964 (D.Colo.1977). The court went on to say that the transaction also did not meet the requirements of horizontal commonality required by *Hirk v. Agri-Research Council, Inc.*, 561 F.2d 96, 101 (7th Cir. 1977). The parties did not contemplate an investment in a common enterprise or the realization of profits from the efforts of others. The fact that the defendant was to receive commissions on sales in connection with his employment relationship with the plaintiff did not transform the transaction into an investment in securities.

The case at bar is indistinguishable from *Frederiksen* and the cases cited therein. The economic reality of the sale of Aligraphy stock to Monarch was the wholesale transfer of Aligraphy's business and its most important asset, its accounts, to Monarch. This was not a typical investment transaction, but rather a commercially rea-

tion itself was only a tangential concern of the statute. The Court was thus reluctant to recognize a federal cause of action in an area so intertwined with the state law of fiduciary duty and such matters traditionally relegated to the state courts. *See generally Issen v. GSC Enterprises, Inc.*, 508 F.Supp. 1298 (N.D.Ill.1981) (Aspen, J.).

Accordingly, even if this Court were to find that it has subject matter jurisdiction over the case at bar, significant questions would exist as to whether Barsy has stated a claim under section 10(b).

8. According to the *Frederiksen* court, the transaction involved in that case:

did not involve a sale of corporate stock to raise capital for profit-making purposes. The plaintiffs sought to acquire [defendant's] business in its entirety. The "stock" sale was a method used to vest [plaintiff] with ownership of that business.... The [defendant's] stock ... merely was passed incidentally as an indicia of ownership of the business assets....

*Frederiksen*, at 1151.

sonable solution to the problems that had developed between Barsy and Verin. The fact that Barsy and Verin conducted separate negotiations with Hansen on behalf of Monarch and that they closed their sales approximately one week apart does not distinguish the cases since the parties agree that Monarch was only interested in the deal if it could acquire all the outstanding stock of Aligraphy. *See* Barsy Affidavit at ¶ 26; Verin Affidavit at ¶ 12; Hansen Deposition at 13 (set forth as Exhibit E–2 to Verin Affidavit). As Barsy stated in response to Verin's motion for summary judgment, in which Verin argued that any alleged nondisclosures occurred after Barsy's sale of stock and thus not "in connection with" the purchase or sale of securities within the meaning of section 10(b):

> [t]he attempt to suggest that Hansen would have bought from Barsy without having secured the terms on which he was buying from Verin has no basis, and notwithstanding the difference of a few days in the actual execution of the documents, it is clear that in the contemplation of the parties and in law for the purpose at hand, the transactions were simultaneous.

Plaintiff's Memorandum in Response to Defendant's Motion for Summary Judgment at 2.

Moreover, as in *Frederiksen*, Verin entered into an employment agreement with Monarch whereby he agreed to "devote his best efforts and his entire business time to advance the interests of Monarch and to perform his duties and responsibilities reasonably assigned to him by the Stockholders of Monarch." Exhibit B to Defendant's Memorandum in Support of Summary Judgment. Monarch thus assumed control of the critical decisions and processes of Aligraphy Barsy terminated his relationship with the printing business and Verin became Monarch's employee. As the court noted in *Frederiksen* the payment of a commission to the former owners or, in this case, a percentage override for a few years, does not convert the transaction into an investment in securities within the meaning of the securities laws. Thus, the rationale of *Frederiksen* would clearly prevent Monarch from suing Barsy or Verin under the federal securities laws, and the same rationale therefore precludes Barsy from maintaining a cause of action against Verin founded upon section 10(b) or Rule 10b–5 in connection with the same transaction.

Accordingly, Barsy's federal claim will be dismissed for lack of subject matter jurisdiction on the Court's own motion pursuant to Rule 12(h)(3). It is so ordered.

■ In the absence of a proper federal claim, the Court declines to exercise jurisdiction over the pendent state law claims and Verin's counterclaim.[9] Courts and commentators generally agree that when a federal claim is dismissed for lack of subject matter jurisdiction, the court need not retain the pendent state claims in the absence of any prejudice to the parties or the commitment of significant judicial time and effort. *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 2064 n.26, 44 L.Ed.2d 621 (1975); *Frederiksen, supra*, at 1153–1154; *Chandler v. Kew, Inc.*, CCH Fed.Sec.L.Rep. [1979] Transfer Binder ¶ 96,966 at 96,054; *Fields v. Fidelity General Insurance Co.*, 454 F.2d 682, 686 (7th Cir. 1971); S. Schenkier, *Ensuring Access to Federal Courts: A Revised Rationale for Pendent Jurisdiction*, 75 Nw.U.L. Rev. 245, 292–93 (1980). Furthermore, even if Verin's counterclaim is viewed as compulsory within the meaning of Fed.R.Civ.P. 13(a), and thus within this Court's ancillary jurisdiction, a court may exercise its discretion to dismiss the counterclaim if the original federal claim is dismissed on jurisdictional grounds and the counterclaim lacks an independent jurisdictional basis of its own. *See Harris v. Steinem*, 571 F.2d 119, 125 (2d Cir. 1978); *National Research Bureau, Inc. v. Bartholomew*, 482 F.2d 386, 389 (3d Cir. 1973); *Great Horizons Development*

---

9. This Court's disposition of this matter renders moot Barsy's Motion to Strike Certain Portions of Verin's Supplemental Affidavit.

*Corp. v. Massachusetts Mutual Life Insurance Co.,* 457 F.Supp. 1066, 1081–82 (N.D. Ind.1978). *Cf. United Mine Workers v. Gibbs,* 383 U.S. 715, 716, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

In the case at bar, the alleged fraudulent activity occurred in 1978. Since the Illinois statute of limitations for common law fraud and breach of fiduciary duty is five years, Ill.Rev.Stat. ch. 83, § 16 (1979), the parties will not be prejudiced by continuing this litigation in state court where it more appropriately should have begun in the first instance.[10]

---

**10.** This *Court's dismissal of the state* claims asserted herein is *without prejudice* to a *subsequent action in* state court. As Professor Moore has noted, "ordinarily a judgment dismissing an action or otherwise denying relief for want of jurisdiction, venue, or related reasons does not preclude a subsequent action in a court of competent jurisdiction on the merits of the cause of action originally involved." 1B Moore's Federal Practice ¶ 0.405[5] at p. 659 n.13 (2d ed. 1980).