**Wayne M. MILLER and Eunice E. Miller, Plaintiffs,**

v.

**AFFILIATED FINANCIAL CORPORATION, et al., Defendants.**

No. 84 C 20108.

United States District Court, N.D. Illinois, W.D.

Nov. 6, 1984.

See also, D.C., 600 F.Supp. 997.

Steven C. Scudder, Holmstrom & Green, P.C., Rockford, Ill., for plaintiffs.

Jack D. Ward, Reno, Zahm, Folgate, Lindberg & Powell, Rockford, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Wayne ("Wayne") and Eunice ("Eunice") Miller (collectively "Millers") have filed an eight-count complaint (the "Complaint") against Delaware corporation Affiliated Financial Corporation ("Affiliated"), Illinois corporation Credit-Pak Corporation of Illinois ("Credit-Pak"), Stephen J. Smith ("Stephen"), Jack D. Smith ("Jack") and Joann Smith ("Joann," apparently Jack's wife). Millers seek damages and equitable relief under federal securities and antiracketeering statutes, Illinois securities and consumer fraud statutes and the common law, charging harm suffered as a result of having entered into a limited partnership agreement devised and promoted by defendants. Defendants have now moved under Fed.R.Civ.P. ("Rule") 12(b)(6) to dismiss all eight counts of the Complaint. For the reasons stated in this memorandum opinion and order, their motion is denied in principal part.

### Facts [1]

In July 1982 Wayne responded to an advertisement in the *Prairie Farmer* by Credit-Pak, representing itself as an organization equipped to help financially straitened farmers in resolving their money woes. On July 29 and on several occasions in August, Wayne met with Stephen, Vice President of Credit-Pak and Affiliated, to discuss ways in which Wayne might re-

---

1. As with every Rule 12(b)(6) motion, Millers' well-pleaded factual allegations are taken as true, with all reasonable factual inferences drawn in their favor. *Wolfolk v. Rivera,* 729 F.2d 1114, 1116 (7th Cir.1984). No actual findings of fact are made or implied.

solve his own money problems. In conjunction with those discussions Stephen undertook a review of Wayne's affairs. On September 1 he wrote Wayne, noting "we are continuing to work on your matter on a best efforts basis" and including an invoice for $4,821.08 for services rendered to date.

Defendants having expended no further efforts on his behalf, in the spring of 1983 Wayne sought the return of documents and papers he had delivered to Stephen the previous summer. During the course of their conversation, Stephen told Wayne it still might be possible to arrange a "creative financing" plan to alleviate Wayne's financial worries. Over the course of further conversations Stephen described the plan as involving a sale and repurchase of land (the "Land") owned by Wayne's mother Eunice, having a fair market value of $700,000 and subject to a first mortgage of some $100,000. Repurchase would take place five years after sale, though it would be subject to extension for an additional five years at Wayne's option, and would involve an increase in the indebtedness on the Land of about $100,000. There would be a $25,000 fee for arranging the financing, payable at the end of the original five-year repurchase period. Defendants also required immediate payment of $8,500 to cover legal and accounting fees associated with preparing the financing plan documents. Eunice paid the required $8,500 to defendants in November 1983.

On December 19 Stephen telephoned Wayne to say a "creative financing" agreement (the "Agreement") had been prepared and had to be signed by the end of the day because the lender would not be accepting loan applications thereafter. Later that day Stephen met with Wayne and spent three to five minutes outlining the Agreement's contents. Stephen repeated his previous representations about the five-year term of the Agreement, the renewal option, the increase in debt on the Land and the $25,000 fee. Under the terms of the Agreement, he explained, Credit-Pak would in effect purchase a portion of the Land, which Wayne would have a right to repurchase over a five-year period. Most importantly, Stephen said the proceeds of the sale to Credit-Pak would be turned over to Wayne so he could pay his debts. Wayne asked whether he could have his lawyer review the Agreement. Stephen discouraged him from doing so, saying a lawyer would not understand a "creative" arrangement of the sort contemplated by the Agreement.[2] Wayne then signed the Agreement. Stephen and Wayne proceeded immediately to Eunice's house where, after Stephen had repeated the explanation and representations previously made to Wayne, Eunice too signed the Agreement. Stephen signed the Agreement in his capacity as Vice President of Affiliated.

In fact the Agreement turned out to be a limited partnership agreement[3] designating Affiliated as sole general partner and Wayne and Eunice as sole limited partners of the Miller Farm Partnership (the "Partnership"). It required Eunice and Wayne to make capital contributions to the Partnership: Eunice, the Land subject to the existing mortgage; Wayne, certain farm machinery and equipment.[4] In exchange

---

**2.** That statement should be contrasted with Stephen's letter to Wayne less than 45 days earlier (on November 7, 1983) (Pl.Ex.C):

> It has been disclosed that the principals of Credit-Pak and Affiliated Financial Corporation are the same. It has also been disclosed that a great deal of risk may exist in any sale/leaseback transaction, and the sellers are advised to seek independent legal counsel.

**3.** That possible structuring as the vehicle for the "creative" financing plan was not unanticipated. Stephen's November 7 letter (Pl.Ex.C) had said:

> It is my understanding that your mother, Eunice Miller, is in complete agreement with

some type of sale/leaseback arrangement, providing she can get her house and one acre of land it is situated on free and clear from the sale/leaseback.

> For tax purposes, we may form some type of entity, such as a limited partnership, with Affiliated Financial Corporation being the only general partner, and both your interest and your mother's interest being in the limited partnership area having no control or authority.

**4.** Agreement ¶ 6 required the equipment to be "free and clear of liens and encumbrances." When it turned out the equipment was encum-

Eunice was to receive a 45% interest and Wayne a 25% interest in the annual net profits or losses of the Partnership. Affiliated, which was to contribute only its services as general partner, received the remaining 30% interest. Other terms of the Agreement included:

1. authorization for Affiliated to obtain on behalf of the Partnership a $400,000 mortgage loan on the Land (the "Mortgage");

2. a $75,000 fee (payable from the Mortgage proceeds) to Affiliated for services rendered as general partner;

3. a lease agreement, in effect obligating Wayne to lease the Land and certain farm equipment from the Partnership;

4. a purchase agreement, in effect obligating Wayne to purchase the Land from the partnership within five years for $900,000;

5. assignment by Wayne of one-half his partnership interest to Affiliated to secure his obligations under the Lease and Land purchase provision; and

6. authorization for Affiliated, at its option, to borrow from the Partnership any surplus proceeds of the Mortgage on an interest-free demand-note basis.

There was however no renewal option covering Wayne's repurchase obligation.

After the Agreement was signed the authorized $400,000 Mortgage was consummated, increasing the encumbrance on the Land and yielding $300,000 in net proceeds after paying off the pre-existing mortgage. But contrary to Stephen's representations, little of that sum has been distributed to Millers:

1. Eunice's $8,500 advance to cover expenses incurred in forming the Partnership has been reimbursed.

2. Two interest-bearing demand loans aggregating $27,000 have been extended to Wayne.

Pointing to those and other discrepancies between the terms of the Agreement and Stephen's description of those terms (upon which plaintiffs had relied in signing),[5] Wayne and Eunice filed this action May 18, 1984.

### Count I

Count I alleges violations of Securities Exchange Act of 1934 ("1934 Act") § 10(b) ("Section 10(b)") and SEC Rule 10b–5 ("Rule 10b–5"[6]). Defendants urge the Complaint lacks any allegation of the use of an instrumentality of interstate commerce, necessary to confer jurisdiction under the statute:

1. All the asserted misrepresentations occurred in wholly intrastate telephone communications.

2. All the mail communications alleged to satisfy the interstate commerce requirement were not causally related to the securities fraud.

Neither argument succeeds, but before this opinion turns to an explanation of why they do not, it must pause over an argument defendants have now abandoned.

Count I is captioned "SECURITIES FRAUD," and it unquestionably seeks to allege material misrepresentations and purchase of securities in reliance thereon—a classic Section 10(b) case. Complaint Count I ¶ 35 accurately *quotes* Section 10(b) but erroneously cites it as 15 U.S.C. § 78*i*(b) ("Section 78i(b)," Section 9 of the 1934 Act) (it should have read 15 U.S.C. § 78*j*(b)). Focusing on that proofreading error, defendants originally based their motion to dismiss Count I on the inapplicability of Section 78*i*(b) to the facts alleged. They chose to ignore the obvious discrepancy

---

bered, Wayne had to substitute in its place rent due him from third parties for the 1984 crop year on land Wayne owned (Pl.Ex.D).

**5.** Other asserted discrepancies involve, for example, the amount of the Land to be encumbered by the financing transaction, the repurchase terms and the omitted possibility of re-

newing the Agreement for an additional five-year term.

**6.** Rule 10b–5 is so well known, and Fed.R.Civ.P. 10 is so seldom in issue, that this minor internal disparity in the terminology used in this opinion may be pardoned.

between the mistaken citation and the statutory language actually quoted at length in the Complaint.[7] Then, after putting Millers' counsel through the unnecessary exercise of addressing the patent error in citation in the course of their responsive memorandum, defendants engaged in a bit of posturing (R.Mem. 1–2):

> With the Plaintiffs' admission of a crucial citation error, Defendants have been apprised of Plaintiffs' securities claim. Plaintiffs have stretched the concept of "notice pleading" to its limits by suggesting that Defendants should have divined the nature of Plaintiffs' claim by reading an incorrect statute citation.

It is now unnecessary to decide specifically whether defendants' counsel acted in bad faith (even though that prospect does appear far more likely than the "empty head, pure heart" alternative), for they surely appear to have violated Rule 11 as amended in 1983. Rule 11 now requires that *every* paper filed with the court by the parties be signed by an attorney who thereby vouches:

> that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

"Improper purpose" was intended to work a substantive change from the older bad-faith test: That is made clear both by the changed language and by the Advisory Committee Notes to revised Rule 11. Because it is utterly unreasonable for anyone to read Count I of the Complaint as setting forth a claim under Section 78i(b), counsel's argument to that effect raises a strong inference of improper purpose. Perhaps Millers' lawyers sustained an easy burden in answering so patently frivolous an argument, but their having to bear it (and Millers' having to pay for it) at all qualifies as harassment. So too, while no court could possibly be misled in any substantive way by such an empty contention, its interposition in the litigation diverts attention from the relevant issues, wastes time and serves to trivialize the litigative and adjudicatory process.[8]

It remains, then, to impose an appropriate sanction on defendants' counsel if they cannot show the absence of an "improper purpose." To that end the order issuing in the present motion includes the following:

1. On or before November 19, 1984 (a) defendants' counsel shall file a memo-

---

**7.** Indeed they underscored the absurdity of their position by also ignoring the fact the very next paragraph, Complaint Count I ¶ 36, accurately cited and quoted Rule 10b–5, alleging it was "promulgated by the Securities and Exchange Commission pursuant to the authority granted by the *above* statute"—an unquestionable reference to Section 10(b).

**8.** What defense counsel's preciousness really did was to cause their substantive challenges to Count I to be advanced only in their Reply Memorandum. That placement shifted the burden of researching and answering defendants' real arguments from Millers' counsel (where that burden belonged) to this Court's law clerk and this Court itself (where it did not). All the work on those issues reflected in this opinion was ours. Unfortunately Rule 11's reference to "an appropriate sanction" does not appear to contemplate (for example) a fine payable to the District Court's fund maintained to reimburse pro bono lawyers for out-of-pocket expenses, or some similar means of repaying the damage done to the justice system itself. Some judges have sought to be creative in devising "appropriate" sanctions in the early days of the new Rule. For example, Judge Schwarzer has required distribution of a copy of the opinion finding a Rule 11 violation to every lawyer in the offending counsel's law firm, *Heuttig & Schromm, Inc. v. Landscape Contractors Council,* 582 F.Supp. 1519, 1522–23 (N.D.Cal.1984). Any such emphasis on internal publicity of course ignores the possibility that the obstructionist tactics may have been known to the offending lawyer's firm generally or may even have made the lawyer a kind of folk hero within the firm. In any case, this Court will not pursue that avenue. Instead it trusts publication of this opinion may have some prophylactic effect on Jack Ward (the lawyer involved here) and perhaps on other lawyers who might be minded to engage in like conduct.

randum detailing any claimed justifications or mitigating factors for their conduct and (b) Millers' counsel shall file a memorandum detailing the damage inflicted by counsel's frivolous argument.

2. On or before November 29, 1984 defendants' counsel shall identify any issues posed by either submission as to which an evidentiary hearing is desired.[9] This Court will then either schedule a hearing or decide the issue.

This opinion now reverts to the substantive issues mentioned earlier. Both turn on asserted jurisdictional flaws in Count I.

■■■■ First, defendants say any misrepresentations made during the course of intrastate telephone calls do not constitute a use of any "means or instrumentality of interstate commerce."[10] Though our Court of Appeals has not had occasion to decide whether local calls satisfy Section 10(b)'s jurisdictional requirement, *Hidell v. International Diversified Investments,* 520 F.2d 529, 536 & n. 15 (7th Cir.1975) (per curiam), most courts addressing the question have held such telephone calls do con-

fer jurisdiction. See, e.g., *Loveridge v. Dreagoux,* 678 F.2d 870, 873–74 (10th Cir. 1982); *Gower v. Cohn,* 643 F.2d 1146, 1151–52 (5th Cir.1981); *Spilker v. Shayne Laboratories, Inc.,* 520 F.2d 523, 524–25 (9th Cir.1975).[11] True enough, a dictum by this Court's colleague Judge Aspen has expressed his disinclination to find the jurisdictional requirement satisfied where the only connection with interstate commerce was an intrastate letter and an intrastate telephone call, both occurring before the negotiations giving rise to the fraud began. *Barsy v. Verin,* 508 F.Supp. 952, 955 & n. 4 (N.D.Ill.1981). Here by contrast at least one of Stephen's telephone conversations with Wayne (on December 19) occurred in the midst of negotiations over the Agreement (Complaint Count I, ¶¶ 25–26); indeed it was the vehicle for crucial misrepresentations. In light of the clear weight of precedent treating intrastate telephone calls as jurisdictionally sufficient, together with the equally clear connection between Stephen's telephone communication and the alleged fraud, defendants' argument fails.[12]

9. Both counsel should be mindful of the possibility that any needless proliferation of time caused by an inappropriate forcing of evidentiary presentation (as contrasted with paper submissions and the elimination by agreement of really non-controverted issues) may itself call Rule 11 into consideration. Even without such a possibility, time spent in ascertaining damage sustained from a Rule 11 violation should also be recoverable on a "but-for" principle (this has been the rule in determining chargeable attorneys' fees under Rule 37(a)(4)).

10. Even if accepted, that argument would not be dispositive. Section 10(b) uses the quoted phrase in the disjunctive with "the use...of the mails," so that *any* mailing—intrastate as well as interstate—suffices to create jurisdiction. This point seems to have been missed in Judge Aspen's discussion in *Barsy v. Verin* (referred to later in this paragraph of the text and in n. 12), which lumped letters and telephone calls together. Nonetheless defendants' argument remains relevant though not conclusive, for under Section 10(b) the jurisdiction-conferring communication must have a causal relationship with the alleged fraud, and if intrastate telephone calls did not qualify in jurisdictional terms there would be no cause of action if only they (and not the mailings) had such a causal relationship.

11. Statutory interpretation is at issue here: Should "the use of any means or instrumentali-

ty *of* interstate commerce" (which would in literal terms include a telephone) be read to require that the instrumentality have been used *in* interstate commerce? Resting jurisdiction on the statutory use of "of" rather than "in" seems to be reliance on a slender reed, but it gains some strength from the broad legislative purpose behind the statute. Section 10(b), the Supreme Court has said, is "meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face." *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). If taken literally rather than in the figurative sense of a direct buyer-seller relationship (not one consummated through a market transaction), that notion can be pushed awfully far. Would it also mean, for example, that a person who perpetrates a securities fraud solely by face-to-face meetings with the victim, but whose attendance at those meetings requires intrastate travel on an interstate highway, satisfies the jurisdictional requirement?

12. *Barsy,* 508 F.Supp. at 955 n. 4 reflects more a lack of connection between the communication and the alleged fraud than a stated conviction that intrastate communications by telephone are jurisdictionally insufficient. So too, *Burke v. Triple A Machine Shop,* 438 F.2d 978, 979 (9th

As to their second position, defendants correctly state plaintiffs cannot prevail in a Section 10(b) action without showing a causal connection between (1) the use of an instrumentality of interstate commerce or the use of the mails and (2) the alleged fraud. But as *Trecker v. Scag,* 481 F.Supp. 861, 864 (E.D.Wis.1979) said:

> It is not required that the manipulative or deceptive device be communicated in the mailed materials, as long as such a device is employed in connection with the use of the mails or of the instruments of interstate commerce.

Stephen's letters to Wayne described in the Complaint (Count II ¶ 49)—two invoices, a letter authorizing the sale/leaseback arrangement and a letter concerning the substitution of rents for the farm equipment as Wayne's capital contribution to the Partnership—satisfy that standard. While none of those documents is a self-contained misrepresentation or other fraudulent communication, they all implement the continuing course of dealings between the parties that constituted the fraudulent scheme. In other words, the letters represent a use of the mails in connection with a transaction alleged to constitute a securities fraud. That is enough to satisfy the Section 10(b) jurisdictional requirement.

### Count II

Count II purports to state a cause of action under the civil remedies provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c): [13]

(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

Plaintiffs predicate their Section 1964(c) suit on an alleged violation of Section 1962(c):

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Each defendant (1) is said to be a "person" (Section 1961(3)) associated with an "enterprise" in fact (Section 1961(1)) comprising all the defendants and (2) has conducted the affairs of that enterprise through a "pattern of racketeering activity" (Section 1961(5)). That "racketeering activity" includes alleged acts of securities fraud (Section 1961(1)(D)) and mail fraud (Section 1961(1)(B)).

Defendants attack those allegations as failing to assert injury *"by reason of* a violation of section 1962" (emphasis added), as Section 1964(c) requires. This Court has never given the underscored phrase the added (not merely causative) content ascribed to it by many judges in high places (see, e.g., *Bankers Trust Co. v. Rhoades,* 741 F.2d 511, 516–18 (2d Cir.1984)). And

---

Cir.1971), the only Court of Appeals case cited by *Hidell* for the proposition that intrastate phone calls are insufficient, was more narrowly construed by the Ninth Circuit itself just a week before *Hidell* (*Spilker,* 520 F.2d at 525):

> The defendant contends on appeal, as the trial court apparently assumed, that our opinion in *Burke* held as a matter of law that Congress did not intend for the Securities and Exchange Act of 1934 to reach purely *intra* state activities relating to the sale of securities. We do not read *Burke* so broadly. There is no indication in *Burke* that the two local telephone calls in that case were part of the stock transaction in question, and thus it could not

be said that an instrumentality of interstate commerce was used "in connection with the purchase ... of any security" within the meaning of the Act. Thus, all *Burke* stands for is the proposition that the jurisdictional requirement of the Securities and Exchange Act of 1934 is not satisfied where the use of "any means or instrumentality of interstate commerce, or of the mails" is not connected to the transaction in question.

**13.** RICO citations will take the form "Section —," referring to the numbering in Title 18 rather than to RICO's internal numbering.

now the issue is plainly settled in our Circuit, *Haroco, Inc. v. American National Bank & Trust Co.*, 747 F.2d 384 at 398 (7th Cir.1984):

> We conclude that a civil RICO plaintiff need not allege or prove injury beyond any injury to business or property resulting from the underlying acts of racketeering.
>
> * * * * * *
>
> This holding by no means renders superfluous the requirement in section 1964(c) that the plaintiff be injured "by reason of" a violation of section 1962. As we read this "by reason of" language, it simply imposes a proximate cause requirement on plaintiffs. The criminal conduct in violation of section 1962 must, directly or indirectly, have injured the plaintiff's business or property. A defendant who violates section 1962 is not liable for treble damages to everyone he might have injured by other conduct, nor is the defendant liable to those who have not been injured. This causation requirement might not be subtle, elegant or imaginative, but we believe it is based on a straightforward reading of the statute as Congress intended it to be read.

*Haroco* obviates any need to pore over the Complaint to determine whether Millers have alleged injury beyond that resulting from the predicate acts of securities and mail fraud. They have sufficiently stated injury flowing from defendants' acts of racketeering, acts that may be properly analyzed into the configuration set out in Section 1962(c).[14]

■ Defendants are however entitled to strike the prayer for equitable relief from Count II. In addition to treble damages and attorney's fees, Millers there ask (as they do in Count I) for:

> 1. a declaratory judgment that the Agreement is void;
>
> 2. an order compelling the return of all property Millers transferred to defendants pursuant to the Agreement;
>
> 3. an injunction striking the name of any defendant as a beneficiary of life insurance policies purchased pursuant to the Agreement; and
>
> 4. a declaratory judgment that all notes executed by Wayne and payable to Affiliated are void.

As this Court explained at some length in *Kaushal v. State Bank of India*, 556 F.Supp. 576, 581–84 (N.D.Ill.1983), there is nothing in the language, structure or legislative history of private civil RICO to suggest Section 1964(c) was meant to grant private plaintiffs remedies of the sort sought here. See also *Sedima, S.P.R.L. v. Imrex Co.*, 741 F.2d 482, 489–90 n. 20 (2d Cir.1984).[15] Accordingly, paragraphs A, B, D and E of Count II's prayer for relief are stricken.

### Liability of Joann

Wayne and Eunice dealt exclusively with Stephen during the negotiations leading up to their execution of the Agreement. However he acted as agent for the other individual and corporate defendants as well as on his own behalf. Defendants have not challenged those allegations of agency as to Jack, Credit-Pak and Affiliated, but Joann (the secretary of Credit-Pak and Affiliated) does assert their insufficiency. Joann contends (1) corporate officers are not liable

---

14. In stressing the nonexistent defect just discussed in the text, defendants have overlooked a real flaw. Count II's allegations of the "enterprise" and its relation to the "persons" that may properly be RICO targets do not conform to *Haroco*, at 399–402 and its espousal of this Court's opinion in *Parnes v. Heinold Commodities, Inc.*, 548 F.Supp. 20, 23–24 (N.D.Ill.1982). Certainly in its present form Count II cannot support a RICO claim against all the defendants. Millers will have to go back to the drawing boards to reshape Count II more precisely.

15. This is one of the few portions of *Sedima* and *Bankers Trust* with which this Court concurs. This Court's colleague Judge Marshall (despite his stated general agreement with *Kaushal*) would grant rescission-type relief under RICO, *DeMent v. Abbott Capital Corp.*, 589 F.Supp. 1378, 1384–85 (N.D.Ill.1984). This Court finds that distinction—at least to the extent it would call for non-monetary relief—unpersuasive. For such remedies, Millers can (and must) find ample scope in the other counts.

for the illegal actions of others in the corporation merely by virtue of their position and (2) Millers have alleged no other facts indicating Joann's participation in the acts giving rise to Millers' claims.

 Joann's theory seems to be that her position as secretary of the corporate defendants is so tangential to their daily business that it cannot serve as the basis for liability absent specific factual allegations. That argument, however, ignores the apparently close business and personal relations among the three individual defendants (reasonably to be inferred from the facts alleged, see n. 1). It also ignores the specific allegation of agency, a matter of mixed law and fact. Under notice pleading principles and the teaching of *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957) and *Hishon v. King & Spalding*, —— U.S. ——, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984), those are enough to keep Joann in the lawsuit—at least for purposes of determining whether information developed in the course of discovery will support the inferences to be drawn from the Complaint.[16]

### Count V

 Count V charges common-law fraud based on Stephen's knowing misrepresentations to Wayne and Eunice. While acknowledging that would be enough to hold Stephen liable, defendants point to the absence of knowing misrepresentations by the other defendants. Because Illinois law requires such knowledge to state a claim for fraud,[17] those other defendants seek dismissal from Count V. Once again defendants overlook Millers' claim that Stephen acted as agent for the other defendants. As our Court of Appeals has stated in *CFTC v. Premex, Inc.*, 655 F.2d 779, 784 n. 10 (7th Cir.1981):

> Under common law principles of *respondeat superior*, a principal is liable for the deceit of its agent, if committed in the very business the agent was appointed to carry out. This is true even though the agent's specific conduct was carried out without the knowledge of the principal.

See also 1 I.L.P. *Agency* §§ 181–82. It is certainly reasonable to infer Stephen's alleged fraud occurred in the business he was appointed to carry out. Moreover to the extent the other defendants in one way or another participated in Stephen's fraudulent acts, they too are guilty of fraud under Illinois law. *Instituto Nacional de Comercializacion Agricola v. Continental Illinois National Bank & Trust Co.*, 530 F.Supp. 279, 281 (N.D.Ill.1982).

Here too Millers will have to show Stephen was in fact the authorized agent of the other defendants or provide other evidence indicating their participation in his fraudulent acts. For now it is enough they have alleged as much.

### Count VII

Millers also purport to state a claim for innocent misrepresentation under Restatement (Second) of Torts, § 552C ("Section 552C"):

> (1) One who, in a sale, rental or exchange transaction with another, makes a misrepresentation of a material fact for the purpose of inducing the other to act

---

**16.** Of course precisely what Millers must prove to establish Joann's liability varies with the various counts of the Complaint. As to Count I, plaintiffs must establish Joann falls within the derivative liability provisions of 15 U.S.C. § 78t. Similarly as to Count III (brought under the Illinois securities laws) they must prove she is either a "controlling person" (Ill.Rev.Stat. ch. 121½, ¶ 137.2–4) or "other person by or on behalf of whom the sale was made" (Ill.Rev. Stat. ch. 121½, ¶ 137.13.A).

As to Count II (the RICO claim) Millers must show under Section 1964(c) that Joann participated, "directly or indirectly," in the conduct of the alleged enterprise's affairs through a pattern of racketeering activity. Such questions of proof, however, are for another day. For now it is enough that Millers' allegations in all counts are sufficient to sustain the Complaint against Joann.

**17.** *What* must be alleged to state a fraud claim is governed by Illinois law. *How* it must be alleged is governed by Rule 9(b), which provides in part:

> Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

or to refrain from acting in reliance upon it, is subject to liability to the other for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation, even though it is not made fraudulently or negligently.

That provision has been adopted as a common-law rule in some other jurisdictions. See, e.g., *Miller v. Bare,* 457 F.Supp. 1359, 1362–64 (W.D.Pa.1978). But Millers have not cited, and further research has not uncovered, any Illinois cases to similar effect.

██ Quite the contrary inference is in order here. Any right to recover damages for innocent misrepresentation in Illinois appears to be statutory, under the very provision of the Consumer Fraud and Deceptive Business Practices Act (the "Act"), Ill.Rev.Stat. ch. 121½, ¶ 262, that forms the basis of Count IV.[18] As *Duhl v. Nash Realty, Inc.,* 102 Ill.App.3d 483, 495, 57 Ill.Dec. 904, 914, 429 N.E.2d 1267, 1277 (1st Dist.1982) (citations omitted) put it:

> Since the Act affords even broader consumer protection than does the common law action of fraud, it is clear that a plaintiff suing under the Act need not establish all of the elements of fraud as the Act prohibits any deception or false promise.... And it is clear from the language of the Act, particularly its reference to false promises, that liability is not limited to existing material facts. Furthermore, it is well established that under the Act the intention of the seller (his good or bad faith) is not important and a plaintiff can recover under the Act for innocent misrepresentations.

That language plainly implies the Act is the only source of any Illinois action for innocent misrepresentation. Count VII (an attempted common-law counterpart) must be dismissed.

### Count VIII

Here Millers advance a claim for equitable relief based on undue advantage in securing Millers' assent to the Agreement. Under the proper circumstances, Illinois law provides, "equity will act in spite of a contract to avoid the unconscionable result." *People ex rel. Department of Public Works & Buildings v. South East National Bank of Chicago,* 131 Ill.App.2d 238, 243, 266 N.E.2d 778, 782 (1st Dist. 1971); see also 7 I.L.P. *Chancery* §§ 58–59. To that end the court must assess "the totality of the circumstances to determine if there ha[s] been fraud, undue advantage, or unfairness in securing the agreement." *Mearida v. Murphy,* 106 Ill.App.3d 705, 711, 62 Ill.Dec. 380, 384, 435 N.E.2d 1352, 1356 (4th Dist.1982).

Thus defendants are not in a position to say Count VIII does not state a claim. Instead they urge it is "redundant of all the relief requested by Plaintiff in the various counts that precede Count VIII" (Def. Mem. 10) and should for that reason be stricken from the Complaint. Millers have indeed used one set of facts to spawn multiple legal theories, all seeking basically the same relief.

██ Rule 8(e) provides:

> A party may also state as many separate claims or defenses as he has regardless of consistency and whether based on legal, equitable, or maritime grounds.

In the most important sense a mere difference in legal theories based on the same facts does not bespeak a different claim. See our Court of Appeals' discussion in

---

**18.** That section provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

*Minority Police Officers Association of South Bend v. City of South Bend,* 721 F.2d 197, 199–201 (7th Cir.1983). Thus no theoretical justification really exists for labeling as separate "counts" different sets of legal theories predicated on identical facts and producing identical relief. But at least until it becomes necessary to present the trier of fact with the matters Millers must prove in support of each theory, Count VIII poses no defined harm to defendants and will be retained.

### Pendent Jurisdiction

Apart from their already-discussed specific objections to Counts V, VII and VIII, defendants contend all the Complaint's pendent state law claims (Counts III through VIII) must be dismissed for lack of jurisdiction. They do not discuss this Court's discretion to decline pendent jurisdiction under *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Instead they rely on the proposition that dismissal of Counts I and II would leave no basis for federal jurisdiction as to the state law claims. Counts I and II have survived defendants' motion, and so do the pendent claims.

### Conclusion

Defendants' motion to dismiss the Complaint is granted as to Count VII and the prayer for equitable relief in Count II. In all other respects it is denied, though Millers will have to redo Count II to conform to *Haroco* and *Parnes.* Defendants are ordered to answer all surviving portions of the Complaint except Count II on or before November 19, 1984 and to answer Count II within 14 days after being served with that Count in amended form. In addition, counsel for the parties are ordered to follow the Rule 11 procedures directed in the text preceding n. 9. Finally, this action is set for a status report in Rockford at 8:45 a.m. November 20, 1984.